Good morning again. I reserve three minutes for rebuttal. So while we just heard that there are parts of the decision that I'm defending, the district court did make some errors that we have appealed on. The first one is a very simple error of fact, and that is we challenged whether there was probable cause to stop Mr. Brown's vehicle. And here's what we got. We got two people in a house on 113th Street, and they see the red lights, they come out, they see Mr. Brown's car with the lights on, and they see the officers removing him from the car with the lights on, and they see the tasing. And we have that in affidavits. They chose not to take their depositions. Now, we have the officer's testimony saying the lights were off, and the lights were still off when I took him out of the car. And then we have the judge saying, well, your affiants didn't see exactly when the car was stopped. And I'm saying, this is just classic circumstantial evidence. I mean, I do have a direct conflict between the officers and the witnesses about whether the lights were still on when they took him out of the car. And the only basis for the stop is the driving without headlights. There was no other basis? You're correct. That's it. Driving without a headlight. I thought there was something about shots being fired or something in the area. But that's not the basis. Yeah, they had arguments about shots being fired, but they didn't stop this car because shots had been fired. They stopped this car because the headlights were not on. And that's why this is such a big deal. Because those affiants do conflict with the officers about whether the lights were still on the instant after the stop occurred. And that's good enough. And that's circumstantial. It's the classic, you do this in jury instructions. You know, the guy comes in with the raincoat. I didn't see the rain coming on his coat, but I can infer that it's raining outside. So, this is good circumstantial evidence. That is a contested issue of fact. We ought to get to a jury on the stop. Then we have the same problem when it comes to the tasing. Now, we have the affiants. They have the officers. Mr. Brown's dead. So, Mr. Brown gets elbowed in the back and he goes flying into the trunk of the car and he sort of rolls off and goes across the street and faces the officers. And even in the defense brief, they admit that some sort of reaction, if that use of force occurred, is reasonable, is understandable. And they haven't appealed the, I mean, we're going to have a trial over whether there was excessive force at the back of the vehicle. They haven't appealed that. But now we have the question, and the law is real established on this, is it active resistance or not? If it's active resistance, the case law here is that you can use the taser. Now, I've got a problem at another level about doing a chest shot on December 31, 2010, as whether that's an appropriate use of the taser. But that's a harder row for me to hoe than just applying the law the way it is. And there's no active resistance here. We have at least a contested issue of material fact on active resistance. Why? Because the Elston Affidavit says, Mr. Brown backed away, so he was facing the officers and standing on the street. Then the black officer pointed his taser at Mr. Brown and tased him. I did not hear the officer give any warning to Mr. Brown before he was tased. And the officer contradicts that. The officer says, not only did I give a warning, but Mr. Brown was coming at me. He was no longer just standing there. This is Officer Chapman. Chapman, yes. And I think his brother officer alleged the same thing. But I have two affiants, they have two officers. At any rate, we have contested issue of material fact on the issue of active resisting. And we can't solve that without going to the jury. This is not something that is appropriate to grant immunity on. It's something that we have to have a trial over. And it's a really important issue because Dr. Wecht, who's a world-renowned medical examiner, says that that tasing to the chest significantly contributed to his death. So this is an important issue to include in the trial. And that's one of the reasons that we've appealed on that. And then our other issue on our appeal is, is the city responsible on the 1983 claim for the excessive force? And in that regard, we've got three arguments about the city. Number one, it is their custom, it's their policy to permit chest shots. And it was right there. Even though Taser had warned a year earlier to move the preferred target zone down, the city was still teaching shoot to center mass. And we've got that in the record. Secondly, their training is deliberately indifferent to citizens like Mr. Brown because their training in a way that puts these people at risk of impacting the heart when you do this type of tasing. And then thirdly, ratification. They never found and didn't seek these affiance and didn't discover what really happened at the back of the car. And that's the type of investigation that is not designed to find out what really happened. The other point in our appeal is Melendez. There's one more officer that should be included on this issue of deliberate indifference to Mr. Brown in the back of the vehicle. And why do I say Melendez? Because he's the one who first got noticed that Mr. Brown was having trouble breathing. He's the one who had Mr. Brown in his arms when Mr. Brown said, I can't breathe. He's the one who said, who gives a fuck? And that is some indication of an attitude that I think shows lack of respect, lack of caring for a citizen. And I think it informs in part what happened afterwards. Because Melendez says he's gone. But he's not. He's right there by the back of the vehicle. Rosnick says that Melendez helped place Mr. Brown into the zone car. Melendez denies that. So we have Rosnick and Melendez disagreeing. And Rosnick's testimony is at page number 574 to 75. And Melendez is at page number 472. Then Melendez is discussing the grunting noises that Mr. Brown's making in the back of the zone car. And that's at his deposition at 474. And he's discussing that with Rosnick. So they're all part of this effort to do nothing while Mr. Brown is deteriorating in the back of the zone car. And then we have Merritt, who is one of the defendants, saying that Melendez helped them remove Mr. Brown from the zone car after he was unresponsive and helped prop him up against one of the officer's legs. And that's Merritt's Garrity Statement at page number 986. So Melendez is all over this from the very beginning to the end. So you're the appellant here. And the district judge granted qualified immunity to these various officers, Melendez and the others. No. She denied qualified immunity to Sattler, Merritt, and Rosnick. But we're not talking about their case now, right? We're talking about the others. Well, we're only talking about Melendez in this appeal. The tasing issue. Oh, right. Chapman and Alon. But I'm not suing them for the deliberate indifference. Right. But what I'm trying to get at is the district judge has granted qualified immunity to this series of other officers in this appeal, right? On some of these issues. Correct. No. She granted qualified immunity on the tasing. She didn't grant qualified immunity on the bonking. Right. So what I'm trying to get you to tell me is what did she do that was wrong? Is it that she didn't see that there were fact issues? Yes. Yeah, there were a few issues she missed the fact issues on. One was the stop. One was the tasing because he wasn't actively resisting. And the third was Melendez, who was just as culpable as right in the middle of the same set of facts that she denied qualified immunity to Rosnick, Merritt, and Sattler. Did the district judge make any errors of law? Well, to the extent that qualified immunity is a decision on the law, she failed to recognize that there was a contested issue of fact on Melendez and failed to recognize the contested issues of fact on the tasing and on the stop. So those are issues of law, but it's all because she failed to see the fact contest. On your tasing issue, are you complaining about the tasing policy in general as opposed to focusing in on the chest tasing? I'm complaining about the policy that permits a front shot to the chest when the citizen is not actively resisting. If it is a fact question on whether they should have stopped the vehicle in the first place and say you're right, that should go to the jury, what's the consequence of them saying he was illegally stopped? Does all the consequences flow from them having or not? I mean, a lot of times it could be a wrongful stop and there's no harm done other than maybe you held up a citizen for five minutes and getting on their way. Right, but here, of course, we're in Cleveland, and we are in a city where there's a lot of nervousness between citizens and police. And if this man had never been stopped, he's real close to home. He'd have just gone home. He'd still be alive. So every one of these events is a big deal. If he hadn't been stopped, he'd be alive. If he hadn't been tased, he'd be alive. If his condition had been properly addressed in the back of the film crew. Or if he hadn't struggled so much, maybe he'd be alive. Okay, but let's have a trial over that. That's not summary judgment material. I mean, yes, you're right, I've got to live with that. But I'll take that to the jury, but it ought to go to a jury. It's not stuff that ought to be decided on summary judgment. Thank you. Good morning again. To take this in order, let's first talk about the stop, and let's talk about the difference between material facts and non-material facts. Mr. Gerenstein says that because of these two people who state, very clearly state, that they only looked out the window after they saw police sirens. That's what got them looking out the window. And then they say the headlights were on. And Mr. Gerenstein says, well, there's a disputed fact issue because the officers say the headlights were never turned on. That's not material. But why isn't it material? Because the officers say the headlights were never turned on, but we have people who say the headlights were on. So somebody turned them on. Because whether or not they were turned on after the stop is initiated is irrelevant to whether the initial stop was lawful. If the lights were not on, when the— But the officers never said that they turned the lights on. But it doesn't matter. All that matters is whether or not the lights are on when they went lights and sirens and initiated the stop. If you look at the declarations, they're very clear that what drew them to the window, what made them look outside, was the lights and sirens. Therefore, the stop was already initiated. And whether or not the lights were turned on after the stop was lawfully initiated is completely irrelevant to the question of whether or not the stop is lawful. Wasn't there a question of one of the officers of whether they had ordered them to turn the lights on? I don't recall, Your Honor, but again, that would be irrelevant. That would just be irrelevant. All that matters— The officer said, we didn't turn on the lights, and we didn't tell Mr. Brown to turn on the lights, and yet the lights are on, according to these two witnesses. Irrelevant. Wouldn't we be able to infer that the lights had been on all along? No. And the rain analogy doesn't work, and I'll tell you why. The rain analogy is so specific because you walk in with an umbrella and you're soaking wet, and the reason that that works, that you can infer that it must be raining outside, is because nobody walks around with an umbrella on a sunny day and soaks themselves just to walk into a room and fool people. But when people are pulled over by police for various reasons— your lights aren't on, your seatbelt isn't on, you're speeding— what is often the initial reaction? You try to correct. You go, oh, and you say, expletive in your mind, and you flick the lights on, pull your seatbelt on, hit the brake. You do something to correct it. So it does not work. This is not a material fact. This is not a circumstantial piece of evidence that's strong enough. Your inference could well be the correct inference, but isn't there an opposite inference? So we have two competing inferences. Yours may be the stronger one, that the driver of the car will try to correct whatever he or she thinks is the cause of the stop. But it could be that the person's lights were in fact on. I don't think so, Your Honor. Not based on what we have here. We're talking about a flick of a switch. We're talking about something that takes less than an instant to do. And the undisputed testimony is that at the time that the lights and sirens went on, the time the stop was initiated, the lights were not on, the headlights. I'd like to add that there is law that any legitimate basis for a stop, even if it's not the basis in the officer's mind at the time, renders the stop legal. So there is testimony that Mr. Brown was coming from an area where gunshots were recently fired. And if that alone is enough to justify the stop, even if it were not the reason the officers gave, and clearly it was in their mind because they testified about it, but they said that the hard and fast reason that they stopped the car was the lights were not on. So you're saying as a matter of law the police could stop any car coming from an area where shots were fired? No. But I'm saying that in this instance, even if this panel were to believe that there was a fact question as to the lights being on, and I obviously disagree with that, but if you were to believe that, you still need to look at the other circumstances and say whether in this circumstance, given the shooting nearby and that the car was coming from where the shooting was, knowing it was a high crime area and all those things, you also would still have to look and decide, is that enough to justify the stop? And if it were, you'd still have to find in favor of my clients and uphold the district court. So that's the first issue. Now let's get to the next issue, which, Judge Clay, I know you want to talk about, because we almost started talking about it in the last appeal, and that is the idea that Officer Chapman elbowed or somehow, I believe that is the word, bonked Mr. Brown on the neck or the back of the head, which is not part of this appeal, and we didn't move for summary judgment on it because there is clearly a question of fact. As opposed to the issue of the stop of these declarations, it's clear that these declarations do lead to at least a question of fact as to whether or not Officer Chapman, unprovoked, struck a single time, struck Mr. Brown while he was in the course and scope of being placed in the handcuffs before he was handcuffed. But the district court got this one right as well. Mr. Brown's reaction to break away and run, whether it was 2 feet, 10 feet, he took off. He wanted to get away. There's your line between non-resisting and resisting. That's flight. And then he did turn around, and then he was tasered. And so we have to take these facts in the light most favorable to the non-moving party, so in this case we do have to look at the declaration of Vaughn and the declaration of Elston, who both say he was tasered without warning, but there's nowhere in the law, nothing that appellants have pointed to, saying that prior to tasering somebody, you must warn them. So that really doesn't matter. That's one of those non-material facts. And also... What if he's just standing there and not in fact approaching the officers? He's already fled. He's already resisted. And there's a lot that went on at the car that Elston and Vaughn could not... are silent to, nor could they have known about, that would have put the officers more on edge. All these factors matter. If somebody has fled and resisted by fleeing, but stops and turns around and holds up their arms, hypothetically, holds up their arms and says, Officer, here I am, I'm sorry, you certainly could not have an officer tasing under those circumstances. So in a surrender circumstance that is that clear, which, let's be clear, is not what we have here? Hypothetically. In that hypothetical that is so clear? No, absolutely. If someone hypothetically surrenders to that extent, that they have hands up and they are verbally communicating with the officer, then I think that a taser would be inappropriate. Now, some level of force would still be appropriate because I have had cases, and I'm currently litigating one, where what happens is somebody flees and during the flight they fake surrender in order to try to get the officers off guard and they reattempt flight. I actually have two different cases. One that's currently before the circuit and is going to be argued on January 27th and the other which I'm filing summary judgment on on February 18th in front of Judge Darren Upholster. But my point is, that's not something that's unusual for law enforcement. For someone who is fleeing to then try to use that sort of tactic to then get a further advantage in their flight from police. So there are certain circumstances where, yeah, an obvious surrender or something that appears to be one, maybe you've got a lower level of force, maybe now a taser like that isn't appropriate, but probably a takedown is still appropriate in order to make sure that they're not faking. I mean, just standing there and assuming that they're going to then comply with everything else and put their hands behind their back for handcuffing probably isn't fair once they've already shown that they will resist by flight. And bear in mind, it's not just the resistance by flight here. Do you have a case that you would like us to look at for that principle that you just stated that use of force can be made even if the person is surrendering after flight? I don't, offhand, Your Honor. But I will say, generally, in these 1983 cases, you have to do a specific inquiry to all the facts, and it's as they're known to the officer at the time, given what a reasonable officer would understand. And I believe reasonable officers understand that just because someone says, I surrender, just because someone says, I didn't do it, doesn't mean it's absolutely according to royal truth that we now have to assume is absolute, that they could be tricking, they could be faking, they could be lying, and the officers have to proceed. But I don't think you can taser someone just because you think they might be lying. You've got to can taser someone if they're, in fact, approaching you or either trying to escape or trying to harm you. Well, Your Honor, I agree with you, and I think that we're getting a little farther away from what this case is about. And the reality is the reason that the tasering is justified, as the district court correctly points out, is that this court, in Higgins, noted that the line between non-resisting and resisting is flight. Once there's flight, you're a resisting suspect. And in Higgins, they said the tasering was okay. So at a bare minimum, and Higgins was a 2012 case where they said the tasering was okay. At a bare minimum, in 2010, the officers wouldn't have been on notice that tasering in this circumstance would violate someone's constitutional rights. But I don't believe it did here. And I believe that even assuming the facts in favor of the non-moving party. Because there is more to it that we still want to touch on, and it's the interaction at the car, which Elston and Vaughn are silent to, and it's because there's no way they could have been privy to it. And it was that Mr. Brown, they believed him to be intoxicated. These are experienced officers who believed him to be intoxicated. He was non-cooperative, and he was aggressive. He was aggressive in the way he interacted with them. He was aggressive when he got out of the vehicle. As to the drug issue, it's our belief that Mr. Brown was actually on bath salts. But at the time, while bath salts were in northeast Ohio, they were not illegal. It was not until 2011 that they were made illegal. This was in 2010. They were not tested for, but that's what we believe he was under the influence of. Regardless, the officers had a good-faith belief, based on their experience, that he was under the influence, non-cooperative, and then he fled. And also, as the district court notes, great deference must be given to the on-the-spot judgment of officers. And if you just look at that portion of Judge Well's decision, she got it absolutely correct, given the circumstances here, even with the declarations of Vaughn and Elston. The use of the taser did not violate Mr. Brown's constitutional rights. The phrase she used is, it was not objectively unreasonable. And I agree. It was not objectively unreasonable. What about the issue about tasing the chest? The issue about tasing the chest should not be before this court whatsoever. There is no law out there that states that tasing of the chest is in some different way, or considered some different level of force, than any other use of a taser. The best they point to is Taser International, which is a private company. And as an attorney, what they put out there as materials, to me, looks like smart corporate counsel trying to head off any future products liability case. It certainly does not rise to the level of a decision from a court such as this, or the United States Supreme Court. And there is no way that that is sufficient to put anyone on notice. Moreover, it isn't even sufficient today. It's not law. It's just what a company, who, again, I think is just looking at products liability, is putting out there in a cover-your-ass move. It's very simple. It does not do anything to impact, on a legal standpoint, what Officer Chapman did when he chose the AMC. What's your authority for that? Can you cite us a case that says that a directive from the manufacturer of the product that says, hey, this could kill someone  That's not what the directive says, Your Honor. The directive says, specifically, that one in 100,000 tasers bears a risk of cardiac capture, which isn't the same as killing someone. In addition, you're asking me, Your Honor, essentially to cite a negative. And I would just say to you that there is no law, and it is axiomatic that the statement of some private individual or corporation cannot be the law. The law is made by legislators. The law is made by courts. The law is not made by Taser International, just like it's not made by Google, just like it's not made by True Value Hardware or your local grocery store. Are there any cases, pro or con your position, that have to do with tasering of the chest? Yes. I cited them in my brief. Hagen's quickly comes to mind. I can grab my brief and go through them again, Your Honor, but I believe with a minute and a half left, I still need to talk about Melendez. So it's all in my brief. Briefly on the Melendez issue, and I think it's also covered well in our brief, and we talked about it briefly in the last appeal. I just said brief four times in a row. This was a big fight. This guy is going at him. He's gnashing, he's clawing. He's managing to fight off multiple police officers. And so during that struggle, he says, I can't breathe. Melendez says, who gives a fuck? Now that's when he was a combatant. I mean, they really were in a fight. And Mr. Gerardstein, I believe it was in the last appeal, did make the distinction about, when he's in the back seat now, he's no longer a threat, so they behave differently. Well, when Melendez says, who gives a fuck, that's when Mr. Brown is still very much a threat. But he points out that Melendez was, there's evidence he was around even after that. Well, that evidence, I would go back to my last appeal and say, it's not something that was even in the complaint. We were not on notice that that would be an issue. We were not on notice that that would be an issue in this case. We were not on notice that Melendez is standing near the zone car later on was going to be an issue for deliberate indifference. And in fact, the court didn't even consider that issue about Melendez being near the car. And in terms of Melendez being near the car, there were already two other officers, and then the third one showed up. I mean, at what point, there are just too many cooks in the kitchen. If there were three doctors standing there, they couldn't all give CPR at once. There just is a point where even if he could do anything, it's superfluous. If there are three doctors standing around and they see that somebody's not breathing, each of them would have a duty, arguably, to give assistance. But once one doctor gives CPR, the other two don't also give CPR. There's only one mouth. It's impossible to... You can't just render superfluous assistance one on top of the other. It has to be... You have to look at it and say, even if you want to look at Melendez, at that point in time, there were already two to three other officers  So your red light is on. Yes, ma'am. Each of us judges may have a question. My question would be, the district judge allowed the complaint to be amended in certain ways in the future, but that was as part of, my understanding, that's part of her opinion in this case. So there was no time afterwards to actually amend the complaint. If we were to send the case back, would there not then be an opportunity for proper amendment of the complaint to raise the various matters and then for you to respond to that amendment of the complaint? Well, Your Honor, I just think that'd be wholly unfair. I mean, we've already litigated this case for four years. We've done it at great expense. There are individual officers who are sitting there knowing that they are being sued and that their fate's on the line, and this would be something where we're just going to say, plaintiffs made a mistake, and we're just going to say, well, the rules don't really matter. We're going to say forget about it. We're going to do a do-over and just restart discovery all over again. I just think that would be manifestly unfair to defendants and defendants' counsel and the City of Cleveland who's footing the bill for all of this. Thank you. Do either of the judges have any questions? Thank you very much. Thank you. It's always an honor to be in front of this panel. Your Honors, there is a case when an individual runs and then stops and then faces the officers. They can't tase him. That's Baker v. Union Township, just decided in February of this year. We also had Goodwin v. City of Painesville, where that individual, and these are both cited in the brief, ran from the officer at the doorway. The officer followed him into the apartment, tased him in the chest, and he fell. Both of those were denied summary judgment and affirmed by the panels in the Sixth Circuit and remanded. And that makes sense, because there ought to be a way to stop bad conduct and have that recognized and at least enter into a dialogue again as to whether you really need to use force. And that's what the affiants saw. They saw Mr. Brown. And by the way, they could hear both the officers and Brown according to their affidavits, because they kept hearing Mr. Brown saying, What did I do wrong? Which I get. I mean, if his lights were on, he's trying to figure out why they're messing with him. And he asked it repeatedly, and they're going to interpret that as recalcitrance and resistance and, you know, bad conduct by this citizen. And he's going to say, What are these guys messing with me for? But he did what they wanted, and they admit that. He got out of his car. He went to the back of his car. He put his hands on the hood, and then they hit him. And then he rolls off and says, Again, what did I do wrong? But he's facing them, and he's not advancing. That's a contested issue of fact. That's not active resistance at the point they're using force. And they can't escalate by simply tasing him at that point. Now, to go back to the probable cause to stop, it is very relevant because the officers testified that they did not instruct Mr. Brown to turn on the lights of the car, that the lights were off while he was removed from the car, and that they didn't turn on the lights of the car. So we have the same light situation at the time of the stop as we do when the affiants are engaged and viewing the car. That's a contested issue of fact. That's why we insist that the stop is clearly in play. And with respect to Melendez, this isn't a situation like three doctors who are all trying to give care. These are three doctors who nobody did anything and let the guy die, so they're all on the hook. Melendez was close enough. And there are other officers you'll notice that once we sorted it out, we didn't pursue them because they weren't in the proximate locations that Sadler, Merritt, Resnick, and Melendez were. Those are the ones we finally figured out that were right there, able to save his life, and didn't. This deserves a trial. Thank you. Thank you both for your argument. The case will be submitted. Would the court call any remaining cases?  Would you adjourn court, please?